UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Sheng Yang,

      Plaintiff,

v.

    No. 13-cv-1171 (JNE/SER)
    **MEMORANDUM**

Carolyn W. Colvin,              **AND ORDER**
Acting Commissioner of Social Security,

      Defendant.

Plaintiff Sheng Yang's application for Disability Insurance Benefits under Title II of the Social Security Act was denied by the Defendant, the Acting Commissioner of Social Security. Yang brought this action under 42 U.S.C. § 405(g) seeking review of that denial.

Pursuant to Local Rule 7.2, the parties filed cross-motions for summary judgment. On April 30, 2014, the United States Magistrate Judge issued a Report and Recommendation recommending that Yang's motion be denied, that the Commissioner's be granted, and that this matter be dismissed. Yang objected, and the Commissioner responded.

The Court declines to adopt the Report and Recommendation. For the reasons discussed below, Yang's motion for summary judgment is granted, the Commissioner's is denied, and this matter is remanded for further administrative proceedings.

## Background

Yang is a 46-year old woman with an employment history of factory and assembly work dating to the 1980s. Yang has been diagnosed over the years with a number of physical and mental conditions that may impair her ability to perform work-related functions, including carpal

1

tunnel syndrome, lumbar and cervicular radiculopathy, chronic pain disorder, diabetes, hypertension, obesity, and major depression.

Yang's last job was assembling pillows. She left that position in the summer of 2008 after her doctors advised her that she needed to avoid repetitive movements for more than two to three hours at a time due to her longstanding carpal tunnel syndrome. Her employer told her that she could not return to work under such a restriction.

Yang first applied for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income under Title XVI in December of 2008, alleging a disability onset date of July 21, 2008. Her application was initially denied in February of 2009, and then again upon reconsideration in May of 2009. The record does not reveal any further proceedings with respect to that application.

The following year, in May of 2010, Yang reapplied for Disability Insurance Benefits, again alleging a disability onset date of July 21, 2008. This application was initially denied in September of 2010 and upon reconsideration in November of 2010. At that point, Yang requested a hearing before an Administrative Law Judge ("ALJ"), which was held in April of 2012. Yang, who is Hmong and immigrated to the United States as a teenager, testified at the hearing via video and through an interpreter. The ALJ also received testimony from a Vocational Expert ("VE").

The ALJ issued a written decision on May 3, 2012. In that decision, the ALJ performed the five-step disability analysis outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v).[1] At step one, the

---

[1]     The analysis is "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009) (internal citations omitted).

ALJ determined that Yang has not engaged in substantial gainful activity since July 21, 2008.  At

step two, the ALJ found that Yang has the following severe impairments: bilateral carpal tunnel

syndrome, disorders of the back, chronic pain disorder, obesity, hypertension, diabetes, major

depression, and anxiety disorder.  At step three, the ALJ determined that Yang's impairments,

whether singly or in combination, do not meet or medically equal the criteria for any of the

listings.

The ALJ then articulated Yang's residual functional capacity ("RFC") as follows:

> [T]he claimant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) except that she can never climb ladders, ropes and
> scaffolds, and can only occasionally climb ramps and stairs.  In addition, the
> claimant can only occasionally stoop, kneel, crouch, and crawl.  Furthermore, the
> claimant requires the ability to change from a sitting to a standing position (and
> vice versa) at least every hour.  The claimant is also limited to no greater than
> frequent bilateral gross manipulation and fine-finger manipulation of objects.
> Furthermore, the claimant should avoid concentrated exposure to the use of
> hazardous machinery, operational control of moving machinery, and unprotected
> heights.  Moreover, the claimant is limited to occupations that do not require
> communication in the English language.  Finally, the claimant is relegated to the
> performance of simple, routine, and repetitive tasks, in a work environment where
> there is no greater than occasional interaction of superficial nature with coworkers
> and the general public.

At step four, the ALJ determined that this RFC does not preclude Yang from performing her past

relevant work as a hand packager or warehouse worker.  Alternatively, at step five, the ALJ

found that Yang's RFC does not preclude her from performing other jobs in the national

economy – namely, housekeeper, photocopy machine operator, and small products assembler.

Therefore, the ALJ concluded that Yang is not disabled under the Social Security Act and denied

her application for benefits.

Yang requested review of the ALJ's decision by the Appeals Council.  That request was

denied in January of 2013, leaving the ALJ's decision as the final decision of the agency.  Yang

subsequently filed this action seeking reversal of the agency's decision and either an award of

benefits or a remand for further administrative proceedings.  The Commissioner opposes and seeks affirmance of the denial of benefits.

## Discussion

The Court is tasked here with determining whether the agency's decision is "supported by substantial evidence on the record as a whole. . . . Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision."  *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010) (internal citation omitted).  This standard requires the Court to "review the administrative record as a whole, fairly considering the evidence that detracts from the decision as well as the evidence that supports it."  *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001).

In their summary judgment briefing, the parties do not disagree about the ALJ's findings at the first three steps of the disability analysis – that Yang has not engaged in substantial gainful activity since July of 2008, and that she has several physical and mental impairments that qualify as severe but do not meet any of the listings.  However, the parties do dispute the remainder of the ALJ's analysis, as Yang raises a number of challenges to the RFC he articulated and his determinations at steps four and five.

Among Yang's challenges is her contention that the ALJ gave insufficient weight to medical opinions from her treating physician, Dr. Robin Councilman, regarding the functional limitations Yang experiences because of her impairments.  The record demonstrates that Dr. Councilman acted as Yang's primary care provider over the course of the nearly four years that elapsed between the alleged onset of her disability in the summer of 2008 and the administrative hearing before the ALJ in the spring of 2012.  There is thus no dispute that Dr. Councilman

qualifies as a "treating source."  *See* 20 C.F.R. § 404.1502 (defining treating source as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you").  However, the Commissioner argues that the ALJ properly considered Dr. Councilman's opinions, and that any error that may have occurred was harmless.

Regulations prescribe the manner in which an ALJ must evaluate and weigh medical opinions from the claimant's treating sources.  "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2) (2012).  The regulations provide that

> [g]enerally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

*Id.* § 404.1527(c)(2) (2012).  Agency policy binding on the ALJ is clear that to give a treating source opinion "controlling weight" is to "adopt" it.  SSR 96-2P, 1996 WL 3741888, *1 (July 2, 1996) ("If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."); *id.* *2 ("When all of the [20 C.F.R. § 404.1527(c)(2) (2012)] factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.").

5

Furthermore, "a finding that a treating source medical opinion . . . is not entitled to 'controlling weight'" does not mean that the opinion should be rejected.  SSR 96-2P, 1996 WL 3741888, *4.  Even if controlling weight is not due, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 . . . ."  *Id.*  Those factors include the nature and extent of the "treatment relationship" between the claimant and the source of the opinion, the source's "specialization" in the subject matter of the opinion, the "supportability" of the opinion with "medical signs and laboratory findings," the "consistency" of the opinion with the rest of the record, and "other factors."  20 C.F.R. § 404.1527(c)(2)-(6).  As a result of this analysis, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2P, 1996 WL 3741888, *4.

As explained below, substantial evidence on the record as a whole does not support the ALJ's handling of Dr. Councilman's medical opinions.  Because the amount of weight that is given to Dr. Councilman's opinions could affect the ultimate outcome of the disability analysis, the ALJ's decision must be reversed and this matter remanded to the Commissioner for further administrative proceedings.[2]

## I.      Weight.

Dr. Councilman's medical opinions appear in the record in a form entitled "Medical Opinion re: Ability to do Work-Related Activities (Physical)," R.[3] 499-502, and in a one-

---

[2]      Because the ALJ's error with respect to Dr. Councilman's medical opinions is by itself sufficient to require reversal and remand, all of Yang's challenges to the ALJ's decision need not be addressed.

[3]      "R." refers to the administrative record, filed here at ECF No. 11.

paragraph letter, R. 598.  In the letter, Dr. Councilman states that the primary "medical problems

that preclude [Yang] from working" are her recurrent moderate major depression, degenerative

changes in her cervical and lumbar spines, and carpal tunnel syndrome.  In the Medical Opinion

form, Dr. Councilman details the specific ways in which those conditions limit Yang's ability to

meet both the exertional (e.g., sitting, standing, walking, lifting) and nonexertional demands

(e.g., manipulating objects, reaching, maintaining a physical posture, concentrating, sustaining a

stable mood) that may be placed on her in a work environment.

The ALJ determined that the Medical Opinion form "was not entitled to significant

weight," and he similarly give "little weight" to the letter.  The ALJ offered several reasons for

doing so, but as discussed below, none of them is based on "sufficient evidence that a reasonable

person would find adequate to support the decision."  *Hulsey*, 622 F.3d at 922.


### A.  Medically acceptable clinical and laboratory diagnostic techniques.

As one reason for discounting Dr. Councilman's opinions about Yang's limitations, the

ALJ stated that "none of [her] treatment notes suggest that . . . she performed the type of testing

that would provide her with the information to make the specific functional conclusions found in

her opinion form."  As Yang points out, this is factually incorrect.  Dr. Councilman explicitly

stated in the Medical Opinion form that her opinions regarding Yang's functional limitations

were supported by a lumbar spine MRI from August of 2009, a cervical spine MRI from July of

2010, and an EMG from April of 2010.  She also stated in her letter that "significant

degenerative changes of both [Yang's] cervical and lumbar spines" were "seen on MRI . . . ."

Furthermore, Dr. Councilman's treatment notes do reflect that her diagnosis and

treatment of Yang's impairments were informed by the results of these and other "medically

acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2) (2012).
*See, e.g.,* R. 515 (noting that Yang "has EMG confirmed carpal tunne[l]"); R. 476 (noting that
"EMG report from April 20[, 2010] reveals chronic right median neuropathy consistent with
severe carpal tunnel" and "moderate signs of median neuropathy with moderate carpal tunnel"
on the left); R. 752 (noting that "Tinel's and Phalen's [signs] are positive"); R. 469 (ordering "c-
spine MRI" because Yang has "pain syndrome in chest and upper arm (right) that seems given
symptoms, distribution, and lack of response to present medication regime, to be cervical in
origin"); R. 465-67 (noting that Yang is "[h]ere to f/u MRI" indicating "possible cervicular
radiculopathy"); R. 631 (noting that MRI with both cervical and lumbar studies shows
"multilevel mild to moderate degenerative changes" in the neck and lumbar spine with an
"additional finding of a broad-based disc bulge with an annular fissure" at C6-7 and "slight
midline bulging" at L4-5 and L5-S1); R. 757 (noting that Yang has "flexion at the back only to
about 45 degrees, and lateral rotation bilaterally only about 25 degrees").

The Commissioner concedes that, "[a]s a medical professional, [Dr. Councilman] was
qualified to translate [Yang's] magnetic resonance imaging (MRI) and electromyography (EMG)
into specific functional limitations" and that "[t]he ALJ's rationale may have been problematic"
on this point.  The Court agrees, without the qualification.


**B.  Not inconsistent with other substantial evidence.**

The ALJ also stated that he gave little weight to Dr. Councilman's medical opinions
because they are inconsistent with her own treatment notes and those of other of Yang's treating
sources, as well as with the opinions of two State agency doctors who reviewed Yang's medical
records but did not examine her.  Each of these reasons is belied by the record.

## 1.   Treatment records from Dr. Councilman and other treating sources.

First, the ALJ stated that Dr. Councilman's opinions are "not entitled to significant weight" because "none of [her] treatment notes suggest that [Yang] had such extensive limitations" as the Medical Opinion form and the letter indicate.  The ALJ also asserted that Yang's "other records did not seem consistent" with Dr. Councilman's medical opinions.

On this point, the ALJ specifically cited three supposed inconsistencies between Dr. Councilman's opinions and the medical treatment notes that appear in the record: (1) Dr. Councilman's letter stated that Yang's depression was among her primary impairments, yet the treatment notes "repeatedly referred to [Yang's] depression as mild or moderate in severity"; (2) the treatment notes indicated that Dr. Councilman and other physicians "only provided conservative management" of Yang's physical conditions, particularly her "back and hand impairments"; and (3) the treatment notes "did not relate that [Yang] should not work or was on particular work restrictions . . . ."  However, these assertions find no support in the record or the law.

Regarding Yang's mental health, the treatment notes indicate that Yang carried a diagnosis of major depression from her first visit with Dr. Councilman, R. 757 (noting diagnosis of "moderate major depression" and prescribing her Paxil and Elavil on July 10, 2008), through the most recent one that appears in the record, R. 603 (listing "moderate major depression, single episode" under "active problem list" on January 31, 2012).  In addition, Dr. Councilman's notes make clear that she treated Yang for a series of depressive episodes which she characterized as "mild" to "moderate" in severity between 2008 and 2012, and that Dr. Councilman consistently viewed Yang's depression as a serious condition that significantly impacted her functioning. Furthermore, the progress notes from Yang's treatment with Willie Garrett, a licensed

psychologist, list her Axis I diagnosis throughout 2009 and 2010 as "296.32."  R. 331-46.  That diagnostic code corresponds to the listing in the Diagnostic and Statistical Manual of Mental Disorders for "Major Depressive Disorder, Recurrent: Moderate."

Neither the ALJ in the decision nor the Commissioner in her briefing explain how those or any other treatment records could reasonably be viewed as inconsistent with Dr. Councilman's representations in her letter that Yang has "recurrent moderate major depression," as evidenced by the "patient having more depression than remission in the past 3 years," and in the Medical Opinion form that Yang "has suffered with persistent depression" that causes her to experience "large mood swings + frequent periods of intense crying" that would impair her ability to perform in a work setting.  Dr. Councilman does not claim that Yang's depression by itself would preclude her from working; rather, Dr. Councilman's treatment notes and medical opinions indicate that Yang's depression is significant insofar as it is comorbid with her physical conditions.  That position is consistent with the medical evidence in the record.  *See, e.g.,* R. 25-26 (ALJ's own summary that "[Yang's mental health] records indicated that . . . her mental health impairments were interrelated with her physical health impairments" and are "severe").

Next, Dr. Councilman's medical opinions regarding the nature of Yang's functional limitations are not undermined because she and other physicians "only provided conservative management" for Yang's carpal tunnel syndrome and her lumbar and cervicular radiculopathy. It is true that Dr. Councilman provided conservative treatment, such as braces and medication, for those hand and back conditions.  However, the treatment notes in the record demonstrate that Dr. Councilman and her colleagues did recommend more aggressive, invasive treatment, such as injections and surgery, but that Yang declined them.  *See, e.g.,* R. 479 (noting that Yang has "moderate to severe bilateral carpal tunnel – doesn't want to have surgery," so "[w]ill refer to

Sports med for consideration of injection"); R. 631 (noting that Yang "is specifically opposed to any invasive procedures including injections or surgery" for her back).  In fact, the ALJ himself stated outright in a different section of his decision that Yang's doctors "determined that [she] could opt to have [her carpal tunnel syndrome] surgically treated," but Yang "refused the option of surgical intervention and instead opted for ongoing conservative treatment options."  R. 22.  The record thus demonstrates – and the ALJ actually found – that the doctors "only provided conservative management" because Yang was averse to invasive procedures, not because they believed that the severity of Yang's conditions did not warrant aggressive treatment.

In these circumstances, Yang's refusal of surgery and injections may be a relevant consideration as the ALJ weighs the credibility of *Yang's* testimony regarding the severity of her impairments, but it cannot be used to impugn *Dr. Councilman's* medical opinions about those impairments.[4]  *See Gowell v. Apfel*, 242 F.3d 793, 796-97 (8th Cir. 2001) (upholding ALJ's discounting of claimant's subjective complaints of pain where treating physicians prescribed

---

[4]     The ALJ found Yang's testimony only partially credible, and while Yang challenges that decision here, it is "supported by good reasons and substantial evidence."  *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

To the extent that the ALJ draws an adverse inference from Yang's refusal of the aggressive treatment that her doctors recommended for her, 20 C.F.R. § 404.1530 may become relevant on remand.  Under that regulation, the agency may deny benefits to a claimant who meets the definition of disability but who has declined "treatment prescribed by [her] physician [that] can restore [her] ability to work" if the claimant does not have an "acceptable" or "good" reason for that refusal.  The Eighth Circuit has recognized that this regulation requires the adjudicator to make an inquiry into (1) whether the treatment at issue will in fact restore the claimant's ability to work and (2) if it will, whether the reason she has refused it is a good one.  *Burnside v. Apfel*, 223 F.3d 840, 843-44 (8th Cir. 2000).

In this regard, the ALJ's decision refers to a "possibility that surgical intervention could relieve [Yang's] pain and limitations," and it contains the remark that Yang's "choice not to proceed with surgical intervention [for her carpal tunnel syndrome] may have caused her to lose employment in 2008."  R. 22.

However, while the record certainly suggests that the recommended interventions have the potential to alleviate certain of Yang's physical symptoms, it does not reveal to what extent they would restore any lost functioning and it is silent as to the reason why Yang is averse to such treatment.  An inquiry and findings on these matters may be necessary.

only conservative treatment while also noting that claimant "refused to follow some recommendations of her physicians, a refusal which may properly be considered when determining her credibility"); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (finding that claimant's "subjective complaints of disabling pain [due to scoliosis] lacked credibility [because] she has never undergone surgery and has relied on a conservative course of treatment"); *Robinson v. Sullivan*, 956 F.2d 836, 840 (8th Cir. 1992) (finding claimant's complaints of disabling pain to be contradicted by treatment history in which "[a]ll doctors . . . prescribed conservative treatment" and the claimant did not seek more aggressive treatment).

Finally, the ALJ is incorrect that Dr. Councilman's treatment notes "did not relate that [Yang] should not work or was on particular work restrictions . . . ."  To the contrary, the record shows that Dr. Ayham Moty, a colleague of Dr. Councilman's at the NorthPoint Health and Wellness Center, put Yang on a "restriction from work – to avoid repetitive movements for more than 2 to 3 hours at a time" due to her carpal tunnel syndrome on July 17, 2008.  R. 752.  Yang saw Dr. Councilman four days later, on July 21, 2008; the notes from that visit reflect that Yang's "work has told her that she cannot work with work restrictions against repetitive motions, and they do not want her back unless she has surgery for carpal tunnel."  R. 751.  Dr. Councilman expressed the concern that "her work is [not] approaching this legally," but noted that Yang, who was in the midst of a high-risk pregnancy at the time, preferred to "stop the hassle and take an 8-12 week [unpaid] leave" to which she was entitled under FMLA.  *Id.*  After she gave birth and the leave expired, Yang did not return to work.

In addition, in an effort to bulwark the agency's decision, the Commissioner in her brief parses a treatment note that Dr. Councilman wrote in September of 2010, but to which the ALJ did not refer.  That note reads: "Recommended patient talk with attorney – she was trying to

12

apply for SSI while collecting unemployment, though she was employable since she lost her job, her health has deteriorated significantly over the past year." R. 465. Citing that note, the Commissioner quotes Dr. Councilman as stating that "Plaintiff was employable since she lost her job," omitting both the beginning and end of the sentence in which that phrase appears. As written, the import of the note is that, by September of 2010, Yang's "health ha[d] deteriorated significantly" from where it had been in 2008, such that Dr. Councilman recommended that Yang talk with an attorney regarding her application for disability benefits.

Whatever Dr. Councilman's perspective may have been on Yang's employability in 2008 and 2009, it had changed by September of 2010 due to Yang's worsening health problems – a decline that the ALJ himself notes throughout his decision. *See, e.g.,* R. 23 (noting that Yang's "later records indicated that her carpal tunnel was more severe and present in both hands, that she experienced some ongoing radiculopathy into her legs, and that her doctors offered additional medications and treatment to help her manage her physical limitations"); R. 25 (noting that Yang's "treatment records demonstrated that her mental health status did become more limiting after . . . early 2009"); R. 27 (noting Yang's "mental health treatment record showed that she had ongoing issues with depression and anxiety that were significantly exacerbated by her deteriorating socioeconomic and family status"). Dr. Councilman's note attesting to that change cannot fairly be used to undermine the opinions she expressed regarding Yang's limitations in the Medical Opinion form she filled out in November of 2010 and in the letter she wrote in December of 2011.

### 2. Opinions of State agency doctors.

Second, the ALJ stated that he discounted Dr. Councilman's medical opinions because "the State agency doctors . . . provided a significantly different assessment of [Yang's] functioning." The State agency doctors to which the ALJ refers are three non-treating, non-examining sources who reviewed Yang's physical health records in 2009 and 2010 and opined that she was capable of performing a wider range of work than Dr. Councilman's Medical Opinion form would indicate.

In weighing the State agency doctors' opinions, however, *see* 20 C.F.R. § 404.1527(e)(2)(ii) (2012) (requiring ALJ to evaluate and weigh the findings of State agency medical consultants in all cases where treating source's opinion is not given controlling weight), the ALJ found them "only partially credible" because they were inconsistent with records indicating that Yang's impairments were more severe and persistent than those doctors had found. Dr. Councilman's treatment notes, of course, are prominent among those records.

It is thus logically and legally incoherent for the ALJ in one breath to discount the State agency doctors' opinions because they are inconsistent with the weight of the evidence regarding Yang's limitations, and in the next to discredit Dr. Councilman's medical opinions because they are inconsistent with those flawed opinions.

The regulations require an ALJ to evaluate a treating source's medical opinion to determine if it is well-supported and not inconsistent with other substantial evidence. The ALJ's reasoning and conclusions on those points are not themselves supported by substantial evidence on the record as a whole.

**II.     Prejudicial error.**

The ALJ thus erred in evaluating and weighing Dr. Councilman's medical opinions under

20 C.F.R. § 404.1527.  Nevertheless, the Commissioner argues that any error was harmless, such

that the agency's decision must be affirmed.  Whether the error was harmless or not turns on

whether Yang can show that she was prejudiced by it – in other words, whether there is "some

indication that the ALJ would have decided differently if the error had not occurred."  *Byes v.*

*Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).

On this record, it is clear that the ALJ's error was not harmless.  The weight afforded to a

treating source medical opinion influences the ALJ's formulation of the RFC; the RFC, in turn,

"may be the most critical finding contributing to the final determination or decision about

disability."  SSR 96-5P, 1996 WL 374183, *5 (July 2, 1996).

It is thus significant that the medical opinions Dr. Councilman expressed are in many

ways inconsistent with the RFC the ALJ articulated in his decision.  For instance, the ALJ

determined that, with certain qualifications, Yang "has the residual functional capacity to

perform light work as defined in 20 CFR 404.1567(b) . . . ."  That regulation defines "light

work" to "involve[] lifting no more than 20 pounds at a time with frequent lifting or carrying of

objects weighing up to 10 pounds."  However, Dr. Councilman opined that Yang has a

"maximum ability to lift and carry" only ten pounds.  That functional capacity is consistent with

sedentary work, not light work.  *See* 20 C.F.R. § 404.1567(a) (defining sedentary work to

"involve[] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles").

The ALJ also found that Yang is "limited to no greater than frequent bilateral gross

manipulation and fine-finger manipulation of objects."  In vocational terms, "frequent" means

"occurring from one-third to two-thirds of the time . . . ."  SSR 83-10, 1983 WL 31251, *6

(1983).  But Dr. Councilman stated that Yang's carpal tunnel syndrome limits her to gross and fine-finger manipulation of objects for a maximum of only two hours out of eight – that is, one-fourth of the time, which corresponds with "occasional."  *Id.* at *5 (defining "occasional" to mean "occurring from very little up to one-third of the time").

Furthermore, the ALJ's RFC states that Yang "requires the ability to change from a sitting to a standing position (and vice versa) at least every hour."  Dr. Councilman, however, opined that while Yang can sit for an hour before changing position, she can only stand for 15 minutes before needing to change position and she must have the opportunity to walk around for five minutes at one hour intervals, which would necessarily interrupt her work.

It is thus evident that, had the ALJ given greater weight to Dr. Councilman's medical opinions, the RFC may have included more limitations than the ones that were set forth in the decision.  In turn, those additional limitations would have affected the disability analysis at steps four and five, when the ALJ considered whether the specific limitations in Yang's RFC preclude her from performing her past relevant work or any other jobs in the national economy.

The prejudicial effect of the ALJ's error is perhaps most plainly seen with Dr. Councilman's opinion, found on the final page of the Medical Opinion form, that Yang's impairments and treatment would cause her to be absent from work more than three times per month.  In the administrative hearing, the ALJ had the following exchange with the VE:

> Q     And, Mr. Heiman, if I were to add an additional limitation to any of those first three hypotheticals [on which the ALJ based  his determination that Yang could perform her past relevant work and other jobs in the national economy], and if that limitations were that the - - the individual in question might be, what we consider as, off task in the work place as much as 20 percent of any given day in addition to regularly scheduled breaks, would that change the prospect for the past work or other work you've identified?

> A     Yes. That would eliminate all work, Your Honor.

Q.      Okay.   What if, instead of being off task at the work place, the individual was simply absent from the work place an average of three days per month?  Would that change the prospect of the jobs you've identified?

A       Yes.  That would eliminate those jobs as well, Your Honor.

R. 74-75.

On this record, the Court "cannot say that the ALJ would inevitably have reached the same result" if the error had not been made.  *Dewey v. Astrue*, 509 F.3d 447, 449 (8th Cir. 2007). This matter must therefore be remanded for further administrative proceedings.


Based on the files, records, and proceedings herein, and for the reasons discussed above,

IT IS ORDERED THAT:

1.  Plaintiff's Motion for Summary Judgment [ECF No. 15] is GRANTED.

2.  Defendant's Motion for Summary Judgment [ECF No. 22] is DENIED.

3.  The Commissioner's decision is REVERSED.

4.  This matter is REMANDED to the Commissioner for further administrative proceedings not inconsistent with the memorandum above.


LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: July 1, 2014                              s/Joan N. Ericksen
                                                 JOAN N. ERICKSEN
                                                 United States District Judge